**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EVELYN OKPARAEKE,<br><br>            *Plaintiff*,<br><br>      v.<br><br>NEWARK BOARD OF EDUCATION, and<br>KATHY DUKE-JACKSON, Assistant<br>Superintendent, Newark Board of<br>Education, in her individual and official<br>capacities,<br><br>            *Defendants.* | Civil Action No. 20-16149<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

In this matter, Plaintiff Evelyn Okparaeke contends that she was subjected to discrimination and retaliation because of her gender, sex, and/or pregnancy as well as a hostile work environment. Plaintiff asserts claims against her former employer, Defendant Newark Board of Education ("Newark BOE") and the Assistant Superintendent, Defendant Kathy Duke-Jackson (collectively, "Defendants"). Presently before the Court is Defendants' motion for summary judgment, D.E. 30. The Court reviewed all submissions made in support and in opposition to the motion and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).[1] For the reasons stated below, Defendants' motion for summary judgment is

---

[1] The Court refers to Defendants' brief in support of its motion for summary judgment as "Def. Br." (D.E. 30-1); Plaintiff's brief in opposition to the motion for summary judgment as "Plf. Opp." (D.E. 32); and Defendants' reply brief as "Def. Reply" (D.E. 34).

**GRANTED in part** and **DENIED in part**.

I.      **FACTUAL**[2] **AND PROCEDURAL BACKGROUND**

   A.  **Factual Background**

In August 2012, Plaintiff was hired by the Newark Board of Education as the Vice Principal at the Quitman Street Community School ("Quitman").  DSUMF ¶ 1; PSUMF ¶ 1.  In this role, Plaintiff's immediate supervisor was Erkine Glover, the Principal at Quitman.  *Id.*  In 2016, when Glover took the position of Assistant Superintendent, Plaintiff replaced Glover as the Principal at Quitman.  DSUMF ¶ 4; PSUMF ¶ 4.  As Principal, Plaintiff was responsible for "running the entire school operation, including responsibility for being the instructional leader, for providing coaching and instructional support to the administrators and staff, for budget, and for relations with parents and the community."  DSUMF ¶ 7; PSUMF ¶ 7.  During the 2016-17 and 2017-18 school years, Plaintiff continued to be supervised by Glover, and during the 2018-19 school year, Plaintiff was supervised by Duke-Jackson, who had replaced Glover as the Assistant Superintendent.  DSUMF ¶¶ 5, 24; PSUMF ¶¶ 5, 24.

_____

[2] The background facts are drawn from Defendants' Statement of Undisputed Material Facts ("DSUMF"), D.E. 27-1; Plaintiff's Responsive Statement of Material Facts and Supplemental Statement of Disputed Material Facts ("PSUMF"), D.E. 28-1; Defendants' Certification of Counsel ("Adams Cert.") and supporting exhibits, D.E. 30-2 ("Def. Ex.__"); Plaintiff's Certification of Counsel ("Vasquez Cert.") and supporting exhibits, D.E. 33-1 ("Plf. Ex.__"), and Defendants' Supplemental Certification of Counsel ("Adams Supp. Cert.") and supporting exhibits, D.E. 34-1 ("Def. Rep. Ex.__").  When citing to exhibits, the pages numbers cited correspond with those in the ECF header.

Both parties' briefs often lack citations to the factual record and include purported facts that do not appear in the DSUMF or the PSUMF.  Facts that appear only in the briefs and without proper citations to the record will be disregarded by the Court.  *See Jake Ball Trust v. Durst*, No. 12-5225, 2013 WL 4008802, at *1 n.1 (D.N.J. Aug. 5, 2013) ("Facts stated by the parties in their briefs or in their Statements of Material Facts Not in Dispute which were not supported by record citations were disregarded by the Court in accordance with L. Civ. R. 56.1(a).").

Duke-Jackson prepared her first written assessment[3] of Plaintiff's performance in January 2019 ("January Review").  DSUMF ¶ 57; PSUMF ¶ 57.  Duke-Jackson then met with Plaintiff on February 14, 2019, to discuss the review, for which Plaintiff received an overall rating of "effective."  DSUMF ¶ 68; PSUMF ¶ 68; Def. Ex. 5.  After discussing the review, Duke-Jackson advised Plaintiff that she had heard rumors that Plaintiff was pregnant and asked Plaintiff whether this was true.  DSUMF ¶ 68; PSUMF ¶ 68.  Plaintiff confirmed that she was pregnant and informed Duke-Jackson that she had just entered her second trimester and had not yet told many people about the pregnancy.  *Id.*; DSUMF ¶ 69; PSUMF ¶ 69.  Duke-Jackson agreed to keep this information confidential.  DSUMF ¶ 68; PSUMF ¶ 68.  Duke-Jackson then told Plaintiff that she had also heard a rumor that Plaintiff was not planning to return to work after taking leave.  DSUMF ¶ 70; PSUMF ¶ 70.  Plaintiff responded that she did intend to return.  *Id.*  They then discussed who might cover for Plaintiff while she was on leave. DSUMF ¶ 70; PSUMF ¶ 70.  Thereafter, Duke-Jackson advised Plaintiff of another rumor that she had heard: that Plaintiff was telling colleagues that Duke-Jackson was "out to get her." DSUMF ¶ 73; PSUMF ¶ 68.  Plaintiff denied telling colleagues this.  *Id.*

The following day, Plaintiff reached out to her union representative to schedule a call to discuss her interaction with Duke-Jackson.  Plf. Ex. 2.  Plaintiff also followed up with an email complaint to her union representative on February 25, 2019, summarizing the interaction.  *Id.*  The

---

[3] Duke-Jackson prepared three written assessments of Plaintiff during the 2018-19 school year. The same rubric was used for each. *See* Def. Exs. 5, 7, 8.  The rubric rates four competency areas: (1) management and coaching of instructional staff; (2) curriculum, assessment, and instruction; (3) student and family support; and (4) transformational leadership.  Within these competency areas, the observer evaluates anywhere from 4-7 sub-categories of performance, providing a rating of "ineffective," "partially effective," "effective," or "highly effective." As a result, there are 23 individual ratings as well as an "overall" rating.

following month, Duke-Jackson prepared her second written assessment of Plaintiff's performance—the Mid-Year Review—which rated Plaintiff's performance as "ineffective" overall.  DSUMF ¶¶ 77-78; Def. Ex. 7.  Duke-Jackson presented the Mid-Year Review to Plaintiff on April 1, 2019.  DSUMF ¶ 78.  On April 12, 2019, Duke-Jackson prepared and presented Plaintiff with her Annual Review, which rated Plaintiff's performance as "partially effective" overall.  DSUMF ¶ 87; Def. Ex. 8.  Likewise, Superintendent Shakira Harrington observed Plaintiff on April 11, 2019, and Duke-Jackson presented the written assessment from this observation to Plaintiff on April 12, 2019, which also rated Plaintiff as "partially effective" overall ("Harrington Review").[4]  DSUMF ¶ 97; Def. Ex. 9.

Plaintiff submitted numerous formal rebuttals to the "Educator Effectiveness Team" regarding the criticism that she received in her reviews.  *See* Def. Ex. 10.  The first was submitted on April 15, 2019, and it challenged the Mid-Year Review conference, arguing that based on the comments received in the Mid-Year Review, an overall rating of "effective" was warranted.  *See* Def. Ex. 10 at 168-175.  The next was submitted on May 3, 2019, and it challenged the April 5, 2019 observation and April 11, 2019 post-conference, again asserting that an overall rating of "effective" was warranted for the observation that had been held on April 5, 2019.  *Id.* at 161-167.[5]  On May 6, 2019, Plaintiff submitted multiple rebuttals.  Def. Ex. 10 at 143-160.  The first contested the April 11, 2019 observation held by Harrington and the April 12, 2019 post-conference held by

---

[4] The parties agree that Harrington observed Plaintiff's performance on April 11, 2019, and that Duke-Jackson presented a written assessment of this evaluation to Plaintiff on April 12, 2019; however, they dispute whether Harrington was an independent evaluator and whether it was Harington who wrote the assessment, rather than Duke-Jackson.  DSUMF ¶ 97; PSUMF ¶ 98.

[5] The record does not include a written assessment from the April 5, 2019 observation.

Duke-Jackson, arguing that a rating of "effective" was warranted.[6] *See id.* at 158-160. The second contested the April 12, 2019 Annual Review, again arguing that the findings warranted an overall rating of "effective." *Id.* at 143-157.

Around May 2, 2019, Plaintiff received approval for her request to take FMLA/maternity leave from June 27, 2019 through October 25, 2019. DSUMF ¶ 110; PSUMF ¶ 111; Def. Ex. 11. Less than two weeks later, the Newark BOE informed Plaintiff that her contract as principal would not be renewed for the 2019-20 school year and that her employment would be terminated as of June 20, 2019. DSUMF ¶ 111; PSUMF ¶ 112. A few days later, Plaintiff requested that the Newark BOE provide her with a "Statement of Reasons for Non-Renewal." Plf. Opp. at 7; *see* Plf. Ex. 3, 4. The Newark BOE responded with a letter dated May 21, 2019, which stated that the basis for non-renewal was "economy and/or organization restructuring." Plf. Ex. 4. Plaintiff then requested a Donaldson Hearing, which was scheduled for June 26, 2019, and Plaintiff received an updated letter, dated June 7, 2019, which also provided that the basis for Plaintiff's non-renewal was "economy and/or organization restructuring." Plf. Ex. 3. Notwithstanding these letters, Defendants maintain that "Plaintiff's contract was not renewed based on the performance evaluations which reflected that Plaintiff was not doing her job effectively." DSUMF ¶ 112.

### B. Procedural Background

Plaintiff filed suit on November 13, 2020, asserting claims for (1) discrimination based on gender, sex, and/or pregnancy under Title VII and the New Jersey Law Against Discrimination ("NJLAD") (Count One and Count Four, respectively); (2) retaliation under Title VII (Count

---

[6] The Harrington Review appears to have been a partial assessment, as it only provides feedback on one of the twenty-three competency categories along with an overall rating of "partially effective," Def. Ex. 9, and Plaintiff's rebuttal is likewise confined to these areas. Def. Ex. 10 at 158-60.

Two); (3) hostile work environment under Title VII (Count Three); and (4) discrimination based on pregnancy under the New Jersey Family Leave Act ("NJFLA") (Count Five).[7] Defendants subsequently sought leave to file a motion for summary judgment, D.E. 27, which the Court granted, D.E. 29.

## II.    SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

---

[7] A plaintiff may seek recovery under the NJFLA pursuant to either the entitlement theory or the retaliation theory. *Wolpert v. Abbott Lab'ys*, 817 F. Supp. 2d 424, 437-38 (D.N.J. 2011).  Based on the facts alleged, the Court construes Count Five as a retaliation claim.  *See* Compl. ¶ 70 (claiming retaliation "based solely on her sex/gender and/or being pregnant and requesting leave under FMLA"); *see also Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478, 487 (D.N.J. 2002) (acknowledging that claims brought under the FMLA (which mirrors the requirements of the NJFLA) may be brought under the retaliation theory, which is also known as the discrimination theory.).

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## III.   ANALYSIS[8]

### A. Discrimination Claims (Counts One and Four)

Plaintiff asserts gender, sex, and/or pregnancy discrimination claims under Title VII and the NJLAD.  Title VII of the 1964 Civil Rights Act prohibits discrimination on the basis of an "individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  The Pregnancy Discrimination Act, a 1978 amendment to Title VII, provides in relevant part as follows:

> The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work[.]

42. U.S.C. § 2000e(k).  Likewise, the NJLAD makes it illegal

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age . . . , pregnancy or breastfeeding, sex, . . . , disability . . . of any individual . . . to refuse to hire or employ or to bar or to

---

[8] Defendants move, without opposition, to dismiss "[t]he claims asserted against Duke-Jackson individually under Title VII."  Def. Br. at 4 n.1.  Because "Congress did not intend to hold individual employees liable under Title VII," Counts One, Two, and Three are dismissed insofar as they assert claims against Defendant Duke-Jackson—in her individual or official capacity— for violations of Title VII.  *Sheridan v. E.I. DuPont de Nemours & Co*., 100 F.3d 1061, 1078 (3d Cir. 1996); *see also Gretzula v. Camden Cnty. Tech. Sch. Bd. of Educ.*, 965 F. Supp. 2d 478, 486 (D.N.J. 2013) ("Title VII provides for liability against employers, not supervisors," therefore, "[n]aming a supervisor as a defendant in his official capacity is redundant especially when, as in this case, the employer is named as a [d]efendant.").

Individual liability also does not exist under the NJFLA, and only exists under the NJLAD under an aiding and abetting theory of liability.  *See Fisher v. Schott*, No. 13-5549, 2014 WL 6474216, at *6 (D.N.J. Nov. 19, 2014) (finding that "individual liability does not exist as a matter of law under the NJFLA" in light of "the more limited definition of 'employer' under the NJFLA"); *Varughese v. Robert Wood Johnson Med. Sch.*, No. 16-2828, 2017 WL 4270523, at *12 (D.N.J. Sept. 26, 2017) (quoting *Cicchetti v. Morris Cnty. Sheriff's Office*, 194 N.J. 563, 593 (2008)) ("[I]ndividual liability under the NJLAD can only arise through the 'aiding and abetting' mechanism.").  But Defendants have not moved in this regard, and the Court declines to do so *sua sponte*.

> discharge or require to retire . . . from employment such individual
> or to discriminate against such individual in compensation or in
> terms, conditions or privileges of employment[.]

N.J. Stat. Ann. § 10:5-12(a).

The burdens of proof and production for discrimination claims arising under Title VII and the NJLAD are the same. *Martinez v. Nat'l Broad. Co.*, 877 F. Supp. 219, 227 (D.N.J. 1994). Where a plaintiff does not present direct evidence of discrimination, courts apply the three-step, burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under this burden-shifting framework, a plaintiff must first establish a *prima facie* case of discrimination." *Palatnik v. Home Depot, Inc.*, No. 04-1229, 2006 WL 680981, at *8 (D.N.J. Mar. 10, 2006) (internal citations omitted). If a plaintiff puts forth a *prima facie* case, there is a rebuttable presumption of unlawful discrimination. *Id*. To rebut this presumption at the second step, a defendant must produce evidence of a legitimate non-discriminatory reason for its decision. *Id*. At the third step, a plaintiff must prove, by a preponderance of the evidence, that the employer's articulated reason was not the real reason for the employment action but rather was a mere pretext for discrimination. *Id.* These standards are discussed in more detail below.

### 1. First Step - *Prima Facie Case*

To establish a *prima facie* discrimination claim, a plaintiff must demonstrate that she (1) is a member of a protected class; (2) was qualified for and performing the essential functions of the job; (3) suffered termination or an adverse employment action; and (4) the adverse employment action gives rise to an inference of unlawful discrimination. *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (internal citations omitted). The burden of establishing a *prima facie* case is "not onerous." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 270-71 (3d Cir. 2010) (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Here, Plaintiff

argues, and Defendants concede, that Plaintiff establishes a *prima facie* claim for gender, sex, and/or pregnancy discrimination under Title VII and the NJLAD.  Plf. Opp. at 6-10; *see also* Def. Br. at 1, 4-29 (arguing only that Plaintiff cannot meet her pretext burden); Def. Reply at 1-8 (same). Thus, the burden of production shifts to Defendants to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802.

### 2.  Second Step - Non-Discriminatory Reason for the Adverse Employment Action

An employer can satisfy its burden of production at the second step of the *McDonnell Douglas* framework "by introducing evidence which, if taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision."  *Martinez*, 877 F. Supp. at 228.  This burden is "relatively light.'"  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  Moreover, an employer "need not prove that its tendered reason actually motivated its behavior."  *Martinez*, 877 F. Supp. at 228 (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also DiMare v. Metlife Ins. Co.*, No. 07-4268, 2008 WL 5109556, at *2 (D.N.J. Dec. 2, 2008) (explaining that an employer merely needs to articulate, not prove, a non-discriminatory motive at the second step).

Defendants maintains that Plaintiff's contract was not renewed because Duke-Jackson determined that "Plaintiff's job performance was less than effective."  Def. Br. at 5.  In support, Defendants point to the drop in Plaintiff's overall rating on performance evaluations after she became Principal at Quitman.  Def. Br. at 14-15.  Defendants note that while Plaintiff received overall ratings of "highly effective" from Glover in her role as Vice Principal, once Plaintiff was promoted to Principal, Glover rated her as "effective" during the 2016-17 and 2017-18 school

years.[9]  *Id.*  Thereafter, Plaintiff received overall ratings of "effective," "partially effective," and "ineffective" from Duke-Jackson during the 2018-19 school year.  *Id.* at 15-16.  Defendants also point to specific performance-related issues that are identified in Duke-Jackson's evaluations of Plaintiff, both prior to and after learning that Plaintiff was pregnant, including Plaintiff's practice of delegating responsibilities, concerns regarding her leadership, and the passive role that Plaintiff took when it came to addressing parent complaints.  *See, e.g.*, Def. Br. at 15-16 (citing Ex. 5). With this evidence, Defendants meet their minimal burden of production.

In Defendants' reply, Defendants rely on another non-discriminatory reason for termination: economy and/or organization restructuring, which was the reason articulated in Defendants' May 21, 2019, and June 7, 2019, letters to Plaintiff.   Def. Reply at 2-4 (citing Plf. Ex. 3); Plf. Ex. 4.  "[C]ourts ordinarily decline to consider arguments raised for the first time in a reply brief, on the grounds that consideration of the same would prejudice the non-moving party." *In re Blackrock Mt. Funds Advisory Fee Litig.*, 327 F. Supp. 3d 690, 736 n.42 (D.N.J. 2018).  Here, however, this argument was raised by Plaintiff (albeit, in the context of arguing that the reasons proffered by Defendants are inconsistent and thus pretextual), therefore, the Court's ordinary concern of prejudice does not apply.[10]  *See* Plf. Opp. at 8-10.  Defendants then embraced Plaintiff's

---

[9] According to Defendants, Glover intended to provide Plaintiff with an overall rating of "partially effective" on her 2016-17 Mid-Year Review.  DSUMF ¶ 14.  Plaintiff maintains that while Glover indicated that she might receive a "partially effective rating" on that review, once Plaintiff provided Glover with additional documentation, her performance was "effective" (in accordance with the protocols permitted by the Newark BOE) as reflected in the review.  PSUMF ¶ 14.

[10] Plaintiff also relies on this proffered reason to argue that summary judgment should be denied because Defendants' performance-based reason for termination differs from the economy/restructuring-based reason, and thus creates a dispute of material fact as to the basis for non-renewal.  Plf. Opp. at 5.  But Defendants may proffer multiple nondiscriminatory reasons for termination.  And where Defendants proffer sufficient evidence to satisfy their burden as to each nondiscriminatory reason for termination, the burden will shift back to Plaintiff to demonstrate that each proffered reason is pretextual.  *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 476 (3d Cir.

argument in their reply, asserting that Plaintiff fails to satisfy her burden of demonstrating that this basis for termination was pretextual. Def. Reply at 2-4 (citing Plf. Ex. 3). This additional evidence also supports Defendants burden of production.

### 3. Third Step - Proffered Reason is Pretextual

At the third step, a plaintiff "may defeat summary judgment by pointing 'to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Diaz*, 2013 WL 85262, at *6 (quoting *Fuentes*, 32 F.3d at 764). "To discredit the employer's proffered reason, [], the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765 (citations omitted). Instead, a plaintiff must proffer sufficient evidence to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find [each reason] unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (emphasis in original) (internal quotation marks and citations omitted). If the plaintiff does so, "she need not present additional evidence of discrimination beyond her *prima facie* case to survive summary judgment." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (citations omitted). Rather, "the factfinder may infer from the combination of

2005) ("[T]he plaintiff must demonstrate that *each* of the employers proffered nondiscriminatory reasons are pretextual," which "can be done by showing that some of the employers' proffered reasons are a pretext in such a way that the employer's credibility is seriously undermined, therefore throwing all the proffered reasons into doubt." (internal citations omitted)).

the *prima facie* case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." *Id.* (citing *Fuentes*, 32 F.3d at 764).

According to Plaintiff, the inconsistencies between Defendants' proffered reasons for termination—initially, economy and/or restructuring reasons and later performance-based reasons—are such that a reasonable factfinder could rationally find them unworthy of credence and infer that they were a pretext. Plf. Opp. at 2, 9. Plaintiff also attacks each proffered reason on its own, arguing that both the economy/restructuring reason and the performance-based reason are undermined by the record. Plf. Opp. at 9-13. The Court first addresses the latter arguments, before considering the inconsistencies between the proffered reasons.

As to the economy/restructuring reason, Plaintiff contends that because the Newark BOE hired a male replacement to fill Plaintiff's precise role, and paid the replacement a higher salary than Plaintiff, a reasonable factfinder could determine that this proffered reason was pretextual. Plf. Opp. at 10. Plaintiff offers no support for the assertion that her replacement was paid a higher salary. *See* L. Civ. R. 56.1(a). Nevertheless, a reasonable factfinder could find that claiming that Plaintiff was terminated for economic and/or restructuring reasons, and subsequently hiring a male replacement to fill the same role that Plaintiff held—without any indication of restructuring roles within the school and/or the economic benefits of doing so—is inconsistent, and thus creates a genuine dispute of material fact as to whether the proffered reason was pretextual.[11]   And this

---

[11] *Cf. Waldron v. SL Indus., Inc.*, 56 F.3d 491, 497 (3d Cir. 1995) (finding that a jury could reasonably question whether the "reorganization" that ostensibly precipitated the plaintiff's termination was in fact a way of removing the plaintiff for a younger replacement where the evidence demonstrated that the defendant split the plaintiff's job into two roles, fired the plaintiff, offered one-half of his former job to the younger employee while the other half remained unadvertised, and then recombined the jobs and placed the younger employee in the recombined position).

purported basis for termination is further undermined by Defendants' inconsistent positions.[12]

Next, the Court turns to Plaintiff's challenges to Defendants' performance-based reason for termination.[13]  In arguing that a reasonable factfinder could find that Defendants' performance reviews were pretextual, Plaintiff points to the letters of support from parents, students, and colleagues, which describe Plaintiff as "an overall excellent administrator," "responsive to parents," "caring and understanding," and "always willing to go the extra mile for her students and school."  Plf. Opp. at 12 (citing Plf. Ex. 1).  The Third Circuit has held that an employee's assertion of his or her own good performance is insufficient to defeat a motion for summary judgment where the employer has produced performance reviews or documentary evidence of insubordination or poor performance.  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995) (citation omitted).  The same is true for letters of support from the community.  *See Adams v. Borough of Ridley Park*, No. 98-5530, 2000 WL 1781955, at *7 (E.D. Pa. Nov. 8, 2000) (explaining that while the community's view on the plaintiff "might arguably shed light on whether the [defendant] was wrong or mistaken in not reappointing [the plaintiff], it does not shed light on the question of the

---

[12] Defendants first embrace this basis for termination to argue that Plaintiff fails to establish that this basis for termination is pretextual.  Def. Reply at 2-3.  But Defendants then disclaim this basis for termination one page later, arguing that the letters that Plaintiff received inadvertently stated that the basis for termination was "economy and/or organization restructuring," when the actual basis for termination was due to performance.  Def. Reply at 4 n.4.

[13] Defendants argue at length that Plaintiff cannot rely on her past positive performance reviews from Glover and Duke-Jackson to show that the more recent performance reviews were pretextual.  *See* Def. Opp. at 10-11 (citing *Kautz*, 412 F.3d at 474; *Ezold*, 938 F.2d at 528; *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1211 (3d Cir. 1988).  The Court agrees that "prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual" because "[t]o hold otherwise would be to hold that things never change[.]"  *Billet v. CIGNA Corp.*, 940 F.2d 812, 826-27 (3d Cir. 1991) (citations omitted), overruled in part on other grounds, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).  But here, Plaintiff does not rely on such reviews to argue pretext.

[defendant's] motivation."). This is because "[i]t is the *defendants'* view of [the plaintiff's] performance which is at issue in this case," thus, the plaintiff must introduce evidence that contradicts or undermines the defendant's articulated performance concerns. *Id.* (emphasis in original) (citing *Fuentes*, 32 F.3d at 765). As such, the Court does not consider the letters of support.

Plaintiff also contends that Duke-Jackson's performance reviews are "false or contrived." Plf. Opp. at 10-13. To recap, Duke-Jackson completed three written assessments for Plaintiff during the 2018-19 school year.[14] Def. Exs. 5, 7, 8. The first was the January Review, which reflected that Plaintiff's performance was "effective" in twenty out of the twenty-three categories,[15] and "partially effective" in three categories, resulting in an overall rating of "effective." Def. Ex. 5. The next was the Mid-Year Review, which was completed in March 2019 (one month after Plaintiff's interaction with Duke-Jackson) and reflected that Plaintiff's performance was *not* "effective" in any of the twenty-three categories—instead, Plaintiff was rated "partially effective" in thirteen out of the twenty-three categories and "ineffective" in the remaining ten categories (each of which had been rated "effective" on the prior review), resulting in an overall rating of "ineffective."[16] Def. Ex. 7. The final review—the Annual Review—came less than two weeks after Plaintiff received her Mid-Year Review. Def. Ex. 8. This review rated

---

[14] The fourth written assessment that Plaintiff received was a partial assessment based on Harrington's April 11, 2019 observation of Plaintiff, which Duke-Jackson presented to Plaintiff on April 12, 2019. DSUMF ¶ 97; PSUMF ¶¶ 97-98; Def. Ex. 9; *see also supra* n.6. The parties dispute whether this assessment was completed by Harrington independently or in conjunction with Duke-Jackson. DSUMF ¶ 97; PSUMF ¶¶ 97-98.

[15] *See supra* n.3 (explaining the categories that are rated on each written assessment).

[16] Defendants do not explain why thirteen "partially effective" ratings and ten "ineffective" ratings resulted in an overall rating of "ineffective" rather than "partially effective."

Plaintiff "partially effective" in twenty out of the twenty-three categories and "ineffective" in the remaining three categories (an improvement from the ten categories that had been rated "ineffective" two weeks prior on the Mid-Year Review), resulting in an overall rating of "partially effective." *Id.*

In an apparent attempt to explain the discrepancies among these reviews, Defendants represent that the Mid-Year Review was intended to "reflect concerns that had been identified throughout the year, not just since the January [Review]," DSUMF ¶ 79, and that the Annual Review "reflected an assessment of progress made during the entire school year to that time, not just for the period since the prior review." DSUMF ¶ 93. Yet, Defendants also acknowledge (1) that the Mid-Year Review accounts in part for the same period as the January Review (the start of the school year through January, and March, respectively)[17] and (2) that the Mid-Year Review and Annual Reviews account for virtually the same period (the start of the school year through late March, and early April, respectively). As a result, the drastic fluctuation in ratings among the reviews cast doubt on Defendants' articulated concerns.[18] As does the fact that Plaintiff's higher ratings on the Annual Review coincided with an increase in negative feedback.[19] *Compare* Def.

---

[17] DSMUF ¶ 79; *see also* Def. Ex. 5 (indicating that the January Review accounted for the start of the school year through January based on observations such as "[i]nformal and [f]ormal observations have taken place throughout the first part of the year," and feedback regarding "teacher activity completion data as of 1/4/2019.").

[18] Indeed, within a two-month span, and after learning that Plaintiff was pregnant and planned to request leave, the same supervisor who provided twenty "effective," three "partially effective," and zero "ineffective" ratings to Plaintiff then provided Plaintiff with zero "effective," thirteen "partially effective," and ten "ineffective" ratings while accounting, in part, for the same period. And less than two weeks after that, Plaintiff received "partially effective" ratings in twenty out of the twenty-three categories on her Annual Review (an improvement in nearly half of the categories), for effectively the same time frame that was assessed in the Mid-Year Review.

[19] The comments between Plaintiff's Mid-Year Review, for which she received an "ineffective" overall rating, and her Annual Review, for which she received a "partially effective" rating overall,

Exs. 7, 8.

Plaintiff's written rebuttal statements also undermine Defendants' articulated concerns. *See* Plf. Opp. 10-12 (citing Ex. 10). Defendants argue that Plaintiff's rebuttal statements are not sufficient to cast doubt on Duke-Jackson's evaluations because they fail to address most of the deficiencies noted and because they express Plaintiff's own opinion of her performance. Def. Br. at 19-26; Def. Reply at 7-8.[20] The Court disagrees. Plaintiff's April 15, 2019 rebuttal statement, submitted in response to the Mid-Year Review, and Plaintiff's May 6, 2019 rebuttal statement, submitted in response to the Annual Review, together challenge the factual bases of nearly all twenty-three competency ratings included in each review.[21] *See* Def. Ex. 10 at 143-157, 168-175.

---

are virtually the same, with the primary difference being that the Annual Review contains more substantive comments, each of which notes *additional* areas of concern, while providing improved ratings in nearly all individual competency areas. *Compare* Def. Exs. 7, 8.

[20] In support, Defendants cherry-pick language from *Healy* and *Kautz*, both of which are distinguishable. *See Kautz*, 412 F.3d at 466, 474-76 (affirming, in the RIF context, that the plaintiff failed to show that the performance-based reasons articulated in his file were pretextual because rather than assert that they had no factual bases and present some evidence to support this, the plaintiff instead provided explanations for his noted lack of preparation, asserted that he lacked memory of certain criticism, and "ma[de] no effort to show that other criticism was pretextual."); *Healy*, 860 F.2d at 1219-20 (affirming, in the RIF context, that the articulated business reasons did not serve as a pretext because the defendant demonstrated that competitive pressures required consolidating positions, the statistical evidence showed that the RIF did not disproportionately impact older workers, and the replacement demonstrated strengths in areas where the plaintiff had shown weaknesses, while also noting that the RIF context is unique in that "competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired.").

[21] Defendants direct the Court to Plaintiff's rebuttal to the Annual Review to argue that most of Duke-Jackson's comments go undisputed. Def. Br. at 19-23. But as noted above, *supra* n.19, the comments between Plaintiff's Mid-Year Review and Plaintiff's Annual Review remained virtually the same, and Plaintiff disputed the comments in the Mid-Year Review in her rebuttal to that review, and subsequently disputed any additional comments made in the Annual Review in her rebuttal to that review. To the extent that Defendants suggest that Plaintiff needed to re-raise the same contentions made in her Mid-Year rebuttal in her Annual rebuttal, the Court disagrees.

17

By way of example, Plaintiff attacks Duke-Jackson's observation that "[m]ost students at the various grade levels have not met the mark for progress as per Interim and SRI data," Def. Ex. 8 at 132, by contending that this data was not even available at the time of the evaluation.  Def. Ex. 10 at 156.  Likewise, Plaintiff challenges Duke-Jackson's observation that a PD Plan had not been completed for a teacher on CAP by pointing to the date stamps on the "EdReflect" system to demonstrate that she had completed the PD plan for that teacher in October and that it was reopened in February for adjustments.  *Id.* at 144.  And while certain challenges sound more closely in opinion, casting doubt on some of the proffered reasons may be sufficient to throw all of the proffered reasons into doubt.[22]  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 476 (3d Cir. 2005)

Finally, the Court turns to Plaintiff's argument that the inconsistencies between Defendants' proffered reasons for termination—initially, economy and/or restructuring reasons, and later performance-based reasons—are such that a reasonable factfinder could rationally find them unworthy of credence and infer that they were a pretext.  Plf. Opp. at 8-10.  The Court agrees.[23]  Plaintiff received her termination notice in May 2019 and requested a Statement of

---

[22] Defendants also argue that Plaintiff's rebuttal statements are undermined by her deposition testimony because such testimony acknowledges that her performance was subpar in certain areas. Def. Br. at 24-25 (citing Def. Ex. 13 at 164:25-178:30, 181:9-12, 184:10-21, 185:3-23).  But Defendants mischaracterize the cited testimony.  There was no acknowledgement of "subpar" performance.  Instead, when asked about the increase in parent complaints during the 2018-19 school year, Plaintiff offered an explanation: a newly available forum for parents to file complaints that became effective at the start of the school year.  Def. Ex. 13 at 181:9-181:19. And when asked about her involvement in handling such complaints, Plaintiff stated that she took an active role in any incident that required principal involvement, alongside the school's Harassment, Intimidation, and Bullying ("HIB") Specialist.  *Id.* at 181:9-184:21.

[23] *See Laurora*, No. 21-2764, 2022 WL 4093738, at *7 (acknowledging that shifting rationales may establish pretext, while finding that the purportedly shifting rationales provided by appellees (initially, a lack of leadership skills, and later a lack of requisite qualifications and experience) were not contradictory or inconsistent, and thus were not sufficient to establish pretext).

Reasons for Non-Renewal and a Donaldson Hearing thereafter.  Plf. Exs. 3, 9.  In response to each

of these requests, Plaintiff received two letters from the Newark BOE—one dated May 21, 2019,

and one dated June 7, 2019—and each stated that the basis for Plaintiff's non-renewal was

"economy and/or organization restructuring."  Plf. Exs. 3, 4.  Although Defendants now argue that

a document from Plaintiff's Donaldson Hearing file and Dr. Yolanda Mendez's deposition

testimony demonstrate that the reason for termination was performance-based, and that any

inconsistencies were the result of an internal mistake,[24] this is a question of fact for the jury.[25]

In sum, because a reasonable juror could find that Defendants' proffered reasons for

termination are unworthy of credence, Defendants' motion for summary judgment is denied as to

---

[24] Defendants direct the Court to the testimony of Dr. Mendez, the Executive Director of Human
Resource Services at the Newark BOE, who signed the May 21, 2019 and June 7, 2019 letters to
Plaintiff indicating that the basis for non-renewal was "economy and/or organization
restructuring."  Def. Reply at 4 n.4 (citing Def. Ex. 16 at 26:22-31:16, 37:6-38:9, 92:15-98:24).
According to Dr. Mendez, in preparing for her deposition, she came across documents that
indicated that Duke-Jackson listed performance as the reason for nonrenewal in the database; thus,
Dr. Mendez believes that when an individual at the labor office created the letters that were sent
to Plaintiff (containing her signature), they must have inadvertently noted the wrong reason for
non-renewal.  Def. Ex. 16 at 79:24-80:6; 94:19-98:10.  This testimony, without more, creates
nothing more than a dispute of fact.  *See Marino*, 358 F.3d at 247 (quoting *Anderson*, 477 U.S. at
255)) ("In considering a motion for summary judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence
'is to be believed and all justifiable inferences are to be drawn in his favor.'").

[25] The parties also dispute, at length, Plaintiff's initial understanding of the basis for termination—
an argument that the Court need not engage with because "[i]t is the *defendants'* view of [the
plaintiff's] performance which is at issue in this case."  *Adams*, 2000 WL 1781955, at *7 (citing
*Fuentes*, 32 F.3d at 765) (emphasis in original).  Nevertheless, the Court cautions both parties
against mischaracterizing the record in this respect.  For example, Defendants point to Plaintiff's
May 17, 2019 EEOC complaint to argue that Plaintiff failed to mention economic reasons for
discharge and thus understood that this was not the basis for termination; yet the record reflects
that Plaintiff did not receive Defendants' letter that provided the economic/restructuring basis for
termination until at least May 21, 2019.  Def. Reply at 5, Plf. Ex. 4.  Likewise, Plaintiff argues
repeatedly that because "performance was not part of the reason for non-renewal," the hearing did
not address Plaintiff's performance or qualifications, yet Plaintiff herself testified that she spoke
about her accomplishments at the hearing.  Plf. Opp. at 5, 7-8, Def. Ex. 13 at 273:8-274:1.

Plaintiff's discrimination claims.

### B. Retaliation Claim (Counts Two and Five)

Defendants also seek summary judgment as to Plaintiff's retaliation claims under Title VII

and the NJFLA.  Under Title VII, it is unlawful "for an employer to discriminate against any of

his employees . . . because [the employee] has opposed any practice made an unlawful employment

practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42

U.S.C. § 2000e–3(a).  The NJFLA also makes it unlawful for employers to discriminate against

employees for exercising their rights under the statute.  N.J. Stat. Ann. § 34:11B–9; *Wolpert v.*

*Abbott Lab'ys*, 817 F. Supp. 2d 424, 439 (D.N.J. 2011).

Retaliation claims are subject to the same *McDonnell Douglas* burden-shifting analysis as

the discrimination claims: a plaintiff must first establish a *prima facie* case for retaliation under

Title VII or the NJFLA by showing that (1) she engaged in protected activity; (2) the employer

took an adverse employment action against her; and (3) there was a causal connection between her

participation in the protected activity and the adverse employment action.  *Moore v. City of*

*Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006), *as amended* (Sept. 13, 2006); *Gary v. Am.*

*Bread Co., LLC*, No. 19-15017, 2021 WL 5356093, at *6 (D.N.J. Nov. 17, 2021).  If the plaintiff

does so, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its

adverse employment action.  *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir.

2017) (citing *Moore*, 461 F.3d at 342).  And if the employer satisfies that burden, the plaintiff must

"convince the factfinder both that the employer's proffered explanation was false [that is, a

pretext], and that retaliation was the real reason for the adverse employment action." *Id.* (quoting

*Moore*, 461 F.3d at 342).  In other words, a plaintiff must prove, by a preponderance of the

evidence, that the harm would not have occurred but-for the protected activity. *Id.* at 258.

### 1. First Step - *Prima Facie Case*

Defendants contend that Plaintiff's claims must be dismissed because Plaintiff cannot make out a *prima facie* retaliation claim. Defendants assert that Plaintiff fails to establish the first and third elements of a retaliation claim: that she engaged in protected activity, and that there was a causal connection between her participation in such activity and the adverse employment actions. Def. Br. at 30-33.

The first element of a retaliation claim requires a protest of discriminatory employment practices, and that protest—in whatever medium and whether formal or informal—must specifically relate to the protected conduct allegedly being infringed. *Barber v. CSX Dist. Servs.,* 68 F.3d 694, 702 (3d Cir.1995); *see also Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 555 (W.D. Pa. 2019) ("Protected activity under Title VII is whenever an employee complains to management about discrimination so that it is possible for management to discern from the context of the statement that the employee opposes an unlawful employment practice." (internal quotation marks and citations omitted)). Here, there is no dispute that Plaintiff complained to her union representative on multiple occasions about her February 14, 2019 interaction with Duke-Jackson, and that these complaints related to protected conduct. Plf. Opp. at 14-15; Def. Reply at 8-9; Plf. Ex. 2. Defendants argue, however, that because Plaintiff complained to her union representative, as opposed to the administration, Plaintiff did not engage in "protected activity." Def. Reply at 8-9. While Defendants' argument has at least superficial appeal, they offer no legal support for this assertion.[26]

---

[26] *Cf. Hibbard v. Penn-Trafford Sch. Dist.*, No. 13-622, 2014 WL 640253, at *16-17 (W.D. Pa. Feb. 19, 2014) (citing *Barber,* 68 F.3d at 701-02) (finding that the plaintiff's complaint to her union representative was not sufficient to show that she engaged in protected activity—not because

The second element of a *prima facie* retaliation claim requires showing that there was an adverse action.  *Moore*, 461 F.3d at 340-42.  The Supreme Court defines an adverse action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Plaintiff contends, without opposition, that her negative performance reviews and termination were adverse employment actions taken in retaliation for reporting her interaction with Duke-Jackson. Plf. Opp. at 17.  The Court agrees.  *See Clark v. Philadelphia Hous. Auth.*, 701 F. App'x 113, 117 (3d Cir. 2017) (citations omitted) (explaining that for an unfavorable performance review to constitute an adverse employment action sufficient to support a retaliation claim, the plaintiff "must allege facts from which it could be inferred that the unfavorable performance review adversely affected the terms or conditions of her employment.").

To establish the third element of a *prima facie* retaliation claim—the causal connection—the plaintiff "must produce evidence sufficient to raise the inference that her protected activity was the *likely reason* for the adverse employment action."  *Carvalho-Grevious*, 851 F.3d at 259 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)) (emphases in original).  A court may consider a "broad array of evidence" to find a causal link.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283-84 (3d Cir. 2000). "Unusually suggestive" temporal proximity between the protected activity and adverse action "is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr.*

---

it was made to a union representative, but because the contents of the complaint were too vague to plausibly infer that the defendant refused to rescind her resignation in retaliation for her choice to engage in protected activities).

*Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (citations omitted).  Otherwise, a court considers "whether the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id.* (internal quotation marks and citation omitted).

Plaintiff contends that the "timing alone [] establishes pretext." Plf. Opp. at 17.  In support, Plaintiff reiterates that in February 2019, Duke-Jackson learned that Plaintiff was pregnant and planned to take leave, and that Plaintiff complained about this interaction that same month.  *Id.* The following month, Duke-Jackson "began targeting [Plaintiff] with negative performance reports," which continued through May 2019, when Plaintiff learned that her contract would not be renewed.  *Id.*  Plaintiff also cites to *Miller v. Patterson Motors, Inc.*, and *Waters v. Genesis Health Ventures, Inc.*, both of which found that the temporal proximity between the complaint and the adverse action—one week (*Miller*), and three business days (*Waters*)—were "unusually suggestive" and therefore sufficient to create an inference of causality and defeat summary judgment. Plf. Opp. at 17 (citing *Miller v. Patterson Motors, Inc.*, No. 2007-33, 2009 WL 789897, at *25 (W.D. Pa. Mar. 24, 2009); *Waters v. Genesis Health Ventures, Inc.*, No. 3-2909, 2004 WL 2958436, *6 (E.D. Pa. Dec. 21, 2004)).  Here, in contrast, approximately one month passed between Plaintiff's complaint to the union representative and her first negative performance review, and approximately three months passed between the complaint and Plaintiff's termination. Accordingly, those cases do not support Plaintiff's position to the extent claimed, and the Court considers whether timing plus other circumstantial evidence supports the inference of causality.[27]

---

[27] *See Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (temporal proximity of three weeks was not unduly suggestive, thus, "timing plus other evidence" in the context of the record as a whole, were considered); *see also Farrell*, 206 F.3d at 280-81 ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence that support the inference.").

23

Circumstantial evidence may include an "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon*, 503 F.3d 217 at 232-33.  Thus, the Court considers the inconsistent reasons proffered by Defendants for Plaintiff's termination, that is, the initial economy and/or organization restructuring and the later performance-based concerns.[28]  *See* Plf. Opp. at 18 (arguing that such inconsistencies demonstrate pretext).  Likewise, the Court considers the evidence that, as discussed above, undermines each of Defendants' proffered reasons (*i.e.*, the hiring of a male replacement for the precise role that plaintiff held, the drastic variation in reviews that purport to cover some of the same time periods, and the rebuttal statements submitted by Plaintiff that challenge the factual bases of many of the concerns articulated in the reviews).  In light of the timing, coupled with this circumstantial evidence, a reasonable juror could infer that Plaintiff's protected activity was likely the reason for the negative performance reviews and subsequent termination.

### 2.  Step Two - Non-Discriminatory Reason for the Adverse Employment Action

Because Plaintiff makes out a *prima facie* retaliation claim, the Court turns to the second step of the *McDonnell Douglas* framework.  An employer can satisfy its burden of production at the second step by providing evidence that "advance[s] a legitimate, non-retaliatory reason for its conduct." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d

---

[28] *See Farrell*, 206 F.3d at 281 (citation omitted) ("[A] plaintiff may establish the [causal] connection by showing that the employer gave inconsistent reasons for terminating the employee."); *Waddell v. Small Tube Prod., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986) (finding no clear error where the district court concluded that the defendant's proffered reason for failure to rehire was pretextual based on the defendant's inconsistent explanations—claiming on the one hand that the plaintiff was considered for rehiring by mistake, and on the other, that the basis for not rehiring was due to plaintiff's negative attitude and the fact that certain employees were against rehiring the plaintiff).

Cir. 1997)).   Defendants appear to incorporate by reference the "non-discriminatory reason" arguments that were set forth as to the discrimination claims.[29]   Thus, for the reasons set forth above, the Court finds that Defendants have sufficiently established their step two burden of production for purposes of the current motion.

### 3. Step Three - Proffered Reason is Pretextual

At the third step, a plaintiff's "ultimate burden is to prove that retaliatory animus was the but-for cause of the adverse employment action." *Carvalho-Grevious*, 851 F.3d at 258 (internal quotation marks and citation omitted).   Accordingly, a plaintiff "must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342 (quoting *Krouse*, 126 F.3d at 500-01).   A plaintiff can do this by "demonstrat[ing] weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions from which a reasonable juror could conclude that the [d]efendants' explanation is unworthy of credence, and hence infer that the employer did not act for the asserted nonretaliatory reasons." *Carvalho-Grevious*, 851 F.3d at 262 (internal quotation marks and brackets omitted).  The court may "rely largely on the evidence produced in support of [the plaintiff's] *prima facie* case," as "nothing about the *McDonnell Douglas* formula requires [the court] to ration the evidence between one stage or the other." *Id.* (internal quotation marks and citation omitted).

Here, to prevail at trial, Plaintiff need only convince the factfinder that had Plaintiff not complained of her interaction with Duke-Jackson, Defendants would not have issued the negative performance reviews and recommended non-renewal. *See Carvalho-Grevious*, 851 F.3d at 262.

---

[29] *See* Def. Opp. at 30 n.4 (noting in the retaliation section that the same *McDonnell Douglas* burden-shifting framework applies).

Duke-Jackson's first written review of Plaintiff was completed in January 2019.  DSUMF ¶ 57; PSUMF ¶ 57.  This review rated Plaintiff's performance as "effective" overall, with Plaintiff earning "effective" ratings across twenty out of the twenty-three categories, and "partially effective" ratings in only three categories.  Def. Ex. 5.  In February 2019, Duke-Jackson confronted Plaintiff about whether she was pregnant and the extent of the leave that she intended to take, and Plaintiff reported this interaction that same month.  DSUMF ¶¶ 68, 70; PSUMF ¶¶ 68, 70; Plf. Ex. 2.  The following month, Duke-Jackson completed Plaintiff's Mid-Year Review, which rated Plaintiff's performance as "ineffective" overall, with Plaintiff earning zero "effective" ratings (despite receiving twenty "effective" ratings less than two months prior, and during a period which was purportedly accounted for in this review), thirteen "partially effective" ratings, and ten "ineffective" ratings (across categories that had each been rated "effective" less two months prior). DSUMF ¶¶ 77-78; Def. Ex. 7.  And just weeks after that, Duke-Jackson completed Plaintiff's Annual Review, this time rating Plaintiff as "partially effective" overall with "partially effective" ratings across twenty out of the twenty-three categories (including ten that had been rated "ineffective" approximately two weeks before), and "ineffective" ratings across three of the categories.  DSUMF ¶ 87; Def. Ex. 8.  For the reasons set forth above, these inconsistencies raise a factual issue regarding the employer's true motivation, particularly when coupled with the inconsistencies between Defendants' proffered reasons, and the evidence that undermines the economy/restructuring reason.  As such, Plaintiff's claims against Defendants withstand summary judgment.

### C.  Hostile Work Environment Claim (Count Three)

Defendants also seeks summary judgment for Plaintiff's hostile work environment claim. To establish a hostile work environment claim under Title VII, the plaintiff must present evidence

that: (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was severe or pervasive; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for employer liability. *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001) (citation omitted). "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (internal quotation marks and citations omitted). For discrimination to be considered severe or pervasive, it must be "extreme" such that it "alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment." *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient. *Id.* (quoting *Faragher*, 524 U.S. at 788).

Here, Plaintiff concludes, without analysis or citations to the record, that she has established a *prima facie* case for a hostile work environment claim. *See* Plf. Opp. at 18-22. As to the first and second elements, Plaintiff asserts that she was subjected to intentional discrimination when Duke-Jackson "rated [Plaintiff] three different times" "between March and May of 2019," "more than any other principal in [] [Plaintiff's] network, and possibly more than any other principal in the Board," after finding out that Plaintiff would be requesting FMLA in February 2019. *Id.* at 19. Plaintiff continues that each of these ratings indicated that she was an "ineffective" principal, despite her "being a model principal," and that such conduct "was sufficiently severe and pervasive as to alter the terms and conditions of [Plaintiff's] employment."

27

*Id.*  In support, Plaintiff cites to *Zastrow* for the proposition that "two lone incidents" of harassment may be sufficient to satisfy the "severe and pervasive" element.  *Id.* at 20 (citing *Zastrow v. Ikegami Elecs. (U.S.A.) Inc.*, No. 97-3384, 1997 WL 827456, at *3 (D.N.J. Dec. 2, 1997)).  But *Zastrow* is distinguishable.  In *Zastrow*, the plaintiff brought a hostile work environment sexual harassment claim under the NJLAD and the defendant moved to dismiss on the ground that the plaintiff's allegations—that the President of the company attempted to touch the plaintiff's breast on two occasions, each of which were at business receptions with colleagues present—failed to adequately plead severe or pervasive conduct.  *Id.* at *1-3.  The *Zastrow* court disagreed, finding that whether such conduct was "merely offensive" or sufficiently "severe or pervasive enough to create an objectively hostile or abusive work environment" was a question for the jury.  *Id.* The court emphasized that "[o]n a motion to dismiss, the issue is not whether a plaintiff will ultimately prevail but whether [the plaintiff] is entitled to offer evidence to support the claims."  *Id.* (internal quotation marks and citations omitted).

Here, in contrast, Plaintiff is not only entitled to present evidence of severe or pervasive discrimination at this stage, but such evidence—sufficient to produce a genuine dispute of material fact—must be produced.  Plaintiff fails to meet her burden.  Even if the Court assumes that Plaintiff satisfies the first element, Plaintiff provides no basis for a reasonable jury to find that such conduct—an increase in the number of reviews and negative ratings on these reviews—was "severe and pervasive," such that it "alter[ed] the conditions of [Plaintiff's] employment and create[d] an abusive working environment."[30]  *Nitkin*, 67 F.4th at 570.  Thus, Defendants' motion for summary judgment is granted with respect to the hostile work environment claim.

---

[30] Because Plaintiff has not satisfied her burden with respect to the second element, the Court does not address the remaining elements.

## IV.    CONLCUSION

For the reasons stated above, Defendants' motion for summary judgment, D.E. 30, is **GRANTED in part** and **DENIED in part**.  Defendants' motion is **GRANTED** as to Plaintiff's hostile work environment claim and is otherwise **DENIED**.  An appropriate Order accompanies this Opinion.

Dated: July 10, 2023

_____

John Michael Vazquez, U.S.D.J.